## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANELLA MACK and MICHAEL CRUZ, on behalf of themselves and all others similarly situated, | Case No.  16-CV-4133 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| FCA US LLC, a Delaware Limited Liability Company, | |
| Defendant. | |

Plaintiffs Janella Mack and Michael Cruz("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against Defendant FCA US LLC ("FCA"). The following allegations are based upon investigation by Plaintiffs' counsel, upon information and belief, and upon personal knowledge as to Plaintiffs' own facts.

## I.      NATURE OF THE ACTION

1.      This case concerns the simple task of shifting a vehicle into Park. FCA has taken this simple process, traditionally straightforward and free from confusion, and implemented a defective and dangerous gear-shifting mechanism. In short, FCA replaced the traditional gearshift with a joystick and failed to consider the implications to consumer safety.

2.      FCA installed gearshifts in its 2014-15 Jeep Grand Cherokees, 2012-14 Dodge Chargers, and 2012-14 Chrysler 300 sedans (the "Defective Vehicles") that depart from the traditional "PRND" gearshift in favor of the Monostable electronic gearshift (the "E-shift System"). The E-shift System never truly shifts or locks into a gear position, in contrast to a conventional gearshift, but instead remains in a centered or neutral position. As such, the E-shift

1

System does not provide the tactical or visual feedback that drivers are accustomed to receiving from conventional gearshifts.

3.      For the almost one million individuals throughout the United States who drive the Defective Vehicles, the counterintuitive E-shift System has created an unreasonably dangerous risk that drivers will inadvertently fail to park their vehicles while the vehicle is still running. Because the E-shift System does not move into a detent like more traditional gearshift mechanisms, and because FCA has failed to provide a safety override that prevents drivers from exiting their vehicles before safely shifting into the Park position, hundreds of Defective Vehicle owners have reported their vehicles rolling away without a driver behind the wheel.

4.      The E-shift System should not pose an unreasonable safety hazard. In fact, many of FCA's competitors have safely and successfully implemented similar electronic gearshift assemblies that return to a neutral position, but those competitors also designed safety overrides that automatically shift the vehicle into Park if the driver's door is opened and the foot brake is released while the vehicle is still running. This safety override prevents the type of rollaway incidents that plague owners of the Defective Vehicles and illustrates the necessity of designing fail-safe mechanisms for unfamiliar new vehicle technologies.

5.      As a result of the defective E-shift System, the Defective Vehicles are unsafe upon purchase and pose an unreasonable risk of harm to drivers, passengers, and bystanders. The E-shift System has caused and will continue to cause significant damage to individuals and their property. Moreover, the defective E-shift System has reduced the value of the Defective Vehicles, and the loss in value will remain even if the E-shift System is eventually fixed.

## II.    PARTIES

6.    Plaintiff Janella Mack is a resident and citizen of the State of New York and owns a 2015 Jeep Grand Cherokee.

7.    Plaintiff Michael Cruz is a resident and citizen of the State of New York and owns a 2014 Jeep Grand Cherokee.

8.    Defendant FCA US LLC ("FCA") is a limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by holding company Fiat Chrysler Automobiles N.V., a Dutch corporation headquartered in London, United Kingdom. FCA's principal place of business and headquarters is in Auburn Hills, Michigan.

## III.    JURSIDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d). The amount in controversy in this class action exceeds $5,000,000, exclusive of interest and costs, and Plaintiff and some Class members are citizens of states other than where FCA is incorporated or has its primary place of business.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (d) because a substantial part of the events or omissions giving rise to the claims occurred in this District, FCA regularly transacts business in this District, and FCA has continuous and systematic contacts with this District through the sale of the Defective Vehicles in New York.

## IV.    FACTUAL ALLEGATIONS

### A.  FCA emphasizes its dedication to ensuring driver safety.

11.    FCA is a company that touts its dedication to ensuring driver safety. FCA views its "dedication to vehicle safety [a]s consistent with our commitment to being a good corporate citizen." For instance, on its website, FCA informs consumers that it has signed on to the

Proactive Safety Principles, along with eighteen other automakers, to leverage their knowledge and collaborate to enhance safety of the traveling public. FCA also emphasizes driver safety in advertisements and promotional materials distributed throughout the United States, including in New York. Some examples include:



# Jeep

Since 1941, the Jeep brand has
continued to deliver an open invitation to
live life to the fullest, providing
customers unique, versatile and capable
vehicles that provide owners a sense of
safety and security to handle any
adventure with confidence.

Chrysler was founded on the philosophy of design with purpose. To build revolutionary new cars - affordable luxury vehicles known for their innovative, forward-thinking engineering. And it is our purpose today and for tomorrow. .Our alliance with Fiat® Group now gives us the competitive advantage of access to new technologies and advanced engineering solutions that further our mission. Our beautiful purpose. To create the type of exciting, efficient, reliable, safe vehicles you expect and deserve.



**B. Despite its purported dedication to consumer safety, FCA installed an unreasonably dangerous electronic gearshift system.**

12.  Despite its purported dedication to driver safety, FCA nonetheless installed the E-shift System in the Defective Vehicles and created an unreasonably dangerous risk that drivers would suffer significant personal injury and property damage when their vehicles failed to properly shift into Park and began to rollaway without a driver behind the wheel.

13.  The Defective Vehicles utilize an E-shift System developed and assembled by ZF Friedrichshaffen AG ("ZF"). ZF designed the E-shift System according to FCA's specifications, which FCA later incorporated into its vehicle designs and program interface:

> ZF supplies gearshift systems to automotive manufacturers according to their technical and design specifications. The manufacturer designs the integration of the gearshift system into the vehicle operating concept and develops the respective safeguard mechanisms. ZF delivered a fully functional state-of-the-art product, which was integrated into the vehicle architecture by the manufacturer.[1]

14.  The E-shift Systems operate electronically. The gear requested by the driver is transmitted from the shifter via the Controller Area Network Bus to the Transmission Control Module, which then makes the requested shift. The Monostable gearshift does not, however, move into a detent like a traditional gearshift but instead springs back to a centered or neutral position after the driver selects a gear and releases the shifter. Thus, to change gears, the driver depresses a button on the shift lever and moves it to the desired gear position, then the lever springs back to a centered or neutral position. In other words, the E-shift System does not have a separate and identifiable position for each gear setting. The following is a picture of the E-shift System in a Jeep Grand Cherokee:

---

[1] http://jalopnik.com/fiat-chrysler-is-recalling-1-1-million-cars-because-peo-1772561060 (last accessed July 11, 2016).



15.     Importantly, the E-shift System logic allows drivers to exit a running vehicle despite the fact that the vehicle is still in gear. Although a chime sounds and a message displays to warn drivers who attempt to exit a running vehicle when the gearshift is not in Park, this feedback mechanism is insufficient to adequately alert the driver that the vehicle is running **and** still in gear. Furthermore, the E-shift System does not contain a safety override mechanism that prevents drivers from exiting an idling vehicle before it has been properly parked. Therefore, the Defective Vehicles contain a material defect, in part, because they do not possess a fail-safe mechanism that automatically places the car in Park when drivers attempt to exit the vehicle with the engine running and still in gear. Because the drivers can exit the running vehicle while it is still in gear, hundreds of owners have reported instances where unattended Defective Vehicles began to rollaway, resulting in significant personal injury and property damage.

**C. The federal government initiated an investigation into the Defective Vehicles after receiving numerous reports of rollaway incidents.**

16.     The United States Department of Transportation National Highway Traffic Safety

Administration ("NHTSA") Office of Defects Investigation opened Preliminary Evaluation PE15-030 on August 20, 2015, to investigate the rollaway problem with the 2014 Jeep Grand Cherokee. NHSTA found that the E-shift System logic does not protect drivers who intentionally leave the engine running or drivers who do not recognize that the engine continues to run after an attempted shut-off.[2] According to NHTSA, the E-shift System "is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection."[3] The rollaway issue is a significant safety threat because "[d]rivers erroneously concluding their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged."[4]

17.     NHTSA further found that the E-shift System "violates several basic guidelines for vehicle controls, such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often have the greatest impact on driving safely should be the easiest to perform."[5]

18.     In total, NHTSA identified 306 incidents in which the Defective Vehicles began to rollaway after the drivers intended to shift the vehicle into Park. The rollaway issue has resulted in 117 reported crashes. Twenty-eight of the crashed reportedly caused injuries, including three individuals who suffered a fractured pelvis and four others who required

---

[2] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM497024/INOA-EA16002-6630.PDF (last accessed July 20, 2016).
[3] *Id.*
[4] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514210/RCLRPT-16V240-3644.PDF (last accessed July 20, 2016).
[5] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM528576/INCLA-EA16002-8352.PDF (last accessed July 11, 2016).

hospitalization (from a ruptured bladder, fractured kneecap, broken ribs, and damaged right leg, respectively).  Other injuries included reports of a broken nose, facial lacerations requiring stitches, sprained knees, severe bruising, and trauma to legs.[6]

19.    As just a few examples from the dozens listed in NHTSA complaint database:

One customer described two separate rollaway incidents involving his 2015 Jeep Grand Cherokee:

> I HAVE HAD 2 INCIDENTS RELATING TO THE VEHICLE NOT PROPERLY ENGAGING IN PARK, DUE TO THE ELECTRONIC SHIFT MECHANISM. IN ONE INSTANCE I EXITED THE VEHICLE ASSUMING IT WAS IN PARK AND THE VEHICLE WAS STILL IN GEAR. THE VEHICLE WAS IN MY DRIVEWAY, ROLLED FORWARD UNTIL STRIKING THE SIDE OF MY HOUSE. THIS CAUSED DAMAGE TO MY HOUSE AS WELL AS THE LEFT FRONT OF THE VEHICLE. IT WAS FORTUNATE THE VEHICLE WAS ANGLED TOWARDS THE HOUSE, OTHERWISE THE VEHICLE WOULD HAVE GONE THROUGH MY BACK YARD INTO ANOTHER PART OF OUR NEIGHBORHOOD. IN THE SECOND INSTANCE THE VEHICLE WAS JUST OUT OF MY GARAGE. AGAIN, I EXITED THE VEHICLE, THINKING IT WAS IN PARK. THE VEHICLE WAS ACTUALLY IN REVERSE. I EXITED THE VEHICLE AND IT STARTED TO ROLL BACK INTO MY GARAGE WITH THE DRIVER SIDE DOOR OPENED. I WAS ABLE TO QUICKLY JUMP BACK INTO THE MOVING VEHICLE AND APPLY THE BRAKES IN TIME TO STOP THE VEHICLE. IF I HAD NOT BEEN ABLE TO DO SO THE VEHICLE WOULD HAVE STRUCK THE SIDE OF MY GARAGE WITH AN OPEN DOOR.

Two customers described rollaway incidents involving their 2013 Dodge Chargers:

> THE CONTACT OWNS A 2013 DODGE CHARGER. THE CONTACT STATED THAT AFTER SHIFTING INTO THE PARK POSITION AND EXITING THE VEHICLE, IT INDEPENDENTLY ROLLED AWAY AND CRASHED INTO A TREE. THE AIR BAGS DID NOT DEPLOY. THE CONTACT WAS KNOCKED DOWN BY THE DOOR OF THE VEHICLE AND SUSTAINED BRUISING THAT DID NOT REQUIRE MEDICAL ATTENTION.

> TWICE I PULLED IN MY DRIVEWAY AND THOUGHT I PUT THE CAR IN PARK AND WENT TO GATHER MY THINGS BEFORE SHUTTING THE CAR OFF AND INSTEAD OF BEING IN PARK THE CAR CONTINUED FORWARD. THE FIRST TIME IT SCRAPED MY SIDE FENCE AND THE SECOND UNTIL IT HIT MY

---

[6]http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM497024/INOA-EA16002-6630.PDF (last accessed July 11, 2016).

> CHAIN LINK GATE- BENDING THE POSTS AND TAKING THE FENCE GATE OFF THE POSTS. THE FENCE GATE THEM PROCEEDED TO FALL ON TOP OF THE HOOD OF THE CAR. BECAUSE I WAS GATHERING MY ITEMS OFF THE SEAT I DIDN'T NOTICE THE CAR MOVING UNTIL I HEARD THE CRUNCHING SOUND.

Customers also described rollaway incidents involving their 2014 Chrysler 300 sedans:

> THE CONTACT STATED THAT WHILE THE VEHICLE WAS IDLING IN THE PARK POSITION, THE VEHICLE ROLLED AWAY INDEPENDENTLY. AS A RESULT, THE VEHICLE CRASHED INTO TWO OTHER VEHICLES.

> WHEN I PUT THE CAR INTO PARK, IT POPS INTO REVERSE. THEN I HIT THE ENGINE OFF BUTTON, BUT SINCE IT IS IN REVERSE, THE ENGINE STAYS ON. THEN I OPEN THE DOOR TO GET OUT, THINKING THE ENGINE IS OFF AND THE CAR IS IN PARK, AND IT STARTS ROLLING BACKWARD. THIS HAS HAPPENED 6 TIMES. THE CAR IS IN THE SHOP NOW.

20.     A common theme emerges: many drivers believe they have properly pushed the gear shift all the way to the Park position, but likely stopped at the Neutral or Reverse position. The driver believes the transmission is in Park and hits the ignition button to turn the vehicle off or intentionally leaves the vehicle idling. Because the vehicle is not actually in Park, however, the engine continues to run regardless of whether the driver intended to turn it off. The engine is quiet, the visual feedback is inadequate, and the driver fails to realize the vehicle is still running **and** in gear. When the driver exits the vehicle, it begins to rollaway and turns into a freewheeling, forty-five-hundred pound wrecking ball capable of inflicting catastrophic damage to everything and everyone in its path.

**D. Like its competitors, FCA should have (and could have) designed an electronic gearshift system that contained safety override protocols.**

21.     These incidents could have been prevented. Other brands that use ZF electronic gearshift systems, such as Audi, BMW, and Jaguar, design safety override protocols that automatically place the vehicle in Park if the driver attempts to exit a running vehicle before it is placed in the Park position. Some companies, including Toyota, have also developed electronic

shifters with more intuitive, user-friendly designs. For instance, the Toyota Prius has a shifter that returns to its neutral position, but it also contains a button that must be pressed to shift the car into Park.[7]



FCA is more than capable of designing an electronic gearshift assembly to prevent the rollaway problem. In fact, FCA's own Chrysler 200 sedan incorporated a transmission dial, pictured below, that clearly indicates when a vehicle has been placed in Park.[8]

---

[7] http://cars.automotive.com/toyota/prius/2015/photos/interior/gearshift/t3-12-8/ (last accessed July 12, 2016).

[8] http://www.chrysler.com/assets/images/Vehicles/2016/200/vlp/Features/Interior/2016-200-interior-console.jpg (last accessed July 12, 2016)



The above-pictured designs are superior to the E-shift System because they unambiguously link user input to mechanical results—i.e., they provide the tactile and visual feedback drivers expect. A driver simply has to turn the knob completely to the left or push a button to shift into Park. In the Defective Vehicles, however, a driver who presses the gearshift forward could land in either Neutral, Reverse, or Park.

**F.  FCA failed to promptly and adequately notify the Defective Vehicle owners of the rollaway issue.**

22.     Recognizing the significant safety risk posed by the defective E-shift System, FCA changed from the E-shift System to Polystable electronic gearshift assemblies in its 2015 Dodge Chargers, 2015 Chrysler 300 sedans, and 2016 Jeep Grand Cherokees. The Polystable gearshift stays in the position of the selected gear, similar to standard mechanical shifters,

providing drivers with the expected tactile and visual feedback.[9]

23.    Although FCA has finally recognized the danger posed by the E-shift System, as shown by the steps it has taken to protect future Fiat Chrysler vehicle owners from the same defective gearshift, FCA has displayed a significant degree of indifference toward the safety of current Defective Vehicle owners. FCA failed to promptly notify customers about this safety hazard through a recall program, opting to wait until eight months after NHTSA initiated its investigation into the E-shift System to commence a voluntary recall to address the rollaway issue.

24.    But this case does not present the first time FCA has been slow to recall dangerously defective vehicles. Rather, FCA has track record of failing to adequately notify vehicle owners about potential safety issues. For example, in 2013, FCA initially refused to recall 2.7 million Jeep SUVs, despite their link to more than 50 deaths in rear-end vehicle collisions. FCA's lack of compliance led NHTSA Administrator Mark Rosekind to voice the agency's "concerns about slow completion rates, slow or inadequate notifications to consumers, faulty remedies, improper actions by dealers and more"[10] related to 20 separate recalls that affected 10 million vehicles. "Each of these defects presents an unreasonable risk to safety and in each case there is reason to question whether Fiat Chrysler has met its legal obligations."[11]  FCA paid $105 million to NHTSA as a result of its recall issues, the largest penalty ever imposed on an automaker by the safety agency, with additional penalties also possible after FCA admitted to significantly underreporting the number of death and injury claims linked to possible vehicle

---

[9] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM528576/INCLA-EA16002-8352.PDF (last accessed July 11, 2016).
[10] http://www.freep.com/story/money/cars/chrysler/2015/05/18/fca-fiat-chrysler-jeep-recalls-nhtsa-public-hearing/27531875/ (last accessed July 11, 2016).
[11] *Id.*

defects.[12]    According to Mr. Rosekind, FCA's recall and reporting practices "represent[] a significant failure to meet a manufacturer's safety responsibilities."

25.    Moreover, FCA knew from the moment the Defective Vehicles entered the market that they were dangerous and created an unreasonable risk of personal injury and property damage. Long before it initiated a voluntary recall, FCA had "received negative feedback for the Monostable shifters shortly after the subject vehicles entered the market," and "[f]ield data indicate[d] that the design result[ed] in higher error rates during attempted shifts to Park and higher rates of powered rollaway incidents."[13] FCA "determined that existing strategies built into these vehicles to deter drivers from exiting the vehicle after failing to put the transmission into PARK have not stopped some from doing so . . . FCA US has therefore determined that the absence of an additional mechanism to mitigate the effects of driver error in failing to shift the monostable gear selector into PARK prior to exiting the vehicle constitutes a defect presenting a risk to motor vehicle safety."[14]

26.    Despite the voluntary recall, upon information and belief, FCA has not identified a concrete timeline for when it will actually develop and implement a fix for the rollaway safety hazard. The most FCA can currently offer is its desire to "finalize a remedy by the 4th quarter of 2016,"[15] more than a year after the NHTSA began to investigate the rollaway issue  Thus, in derogation of its a so-called commitment to vehicle safety, FCA's lack of urgency is business as usual when confronted with important vehicle safety issues.

---

[12] http://www.nytimes.com/2015/09/30/business/fiat-chrysler-concedes-violating-rule-on-reporting-death-and-injury-claims.html (last accessed July 11, 2016)

[13] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM528576/INCLA-EA16002-8352.PDF (last accessed July 11, 2016).

[14] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514210/RCLRPT-16V240-3644.PDF (last accessed July 11, 2016).

[15] http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM519776/RCMN-16V240-2694.pdf (last accessed July 11, 2016).

27.    With each day that FCA failed to properly notify customers about the safety issues created by the E-shift System, with each day that FCA failed to initiate an aggressive recall campaign to remove the Defective Vehicles from the road, and with each day that FCA fails to implement a fix to remedy the rollaway safety issue, almost one million customers in the United States are at risk of experiencing a rollaway incident like those already experienced by hundreds of other Defective Vehicle owners.

<b><u>PLAINTIFF CRUZ'S EXPERIENCE</u></b>

28.    Plaintiff Cruz purchased his 2014 Jeep Grand Cherokee from a car dealership located in Hempstead, New York.

29.    Plaintiff Cruz experienced a rollaway incident after placing his vehicle in Park upon arriving at home. The gearshift display clearly indicated that the E-shift System was in Park.  Nonetheless, upon exiting his vehicle, the vehicle began to rollaway and ultimately struck his garage door.

30.    As a result of the rollaway, Plaintiff Cruz has been damaged.

<b><u>PLAINTIFF MACK'S EXPERIENCE</u></b>

31.    Plaintiff Mack purchased her 2015 Jeep Grand Cherokee from a car dealership located in New York.

32.    Plaintiff Mack experienced a rollaway incident outside of her grandmother's residence. Upon placing her vehicle in Park, and as she was removing items from the vehicle, Plaintiff Mack's 2015 Grand Cherokee began to rollaway and ultimately collided with another vehicle.

33.    Plaintiff Mack reported the rollaway incident to her to the dealership where she purchased her 2015 Grand Cherokee. Her vehicle was inspected and then later released to her. One week later she received the recall notice in the mail.

34.    As a result of the rollaway, Plaintiff Mack's Defective Vehicle has been damaged. She has also incurred out of pocket costs related to the rollaway incident.

## V.    CLASS ALLEGATIONS

35.    Plaintiffs bring this action against FCA both individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on their own behalf and on behalf of the following Class:

> All persons in the United States who purchased or leased a Defective Vehicle (hereinafter, the "Nationwide Class").

36.    Alternatively, or in addition to the Nationwide Class, Plaintiffs also bring claims pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following subclass:

> All persons in New York who purchased or leased a Defective Vehicle (hereinafter, the "New York Subclass").

37.    Excluded from the Class and Subclasses are: (a) any Judge or Magistrate presiding over this action, and members of their families; (b) FCA and any entity in which FCA has a controlling interest, or which has a controlling interest in FCA; (c) the officers, directors, or employees of FCA; (d) FCA's legal representatives, assigns, and successors; and (e) all persons who properly execute and file a timely request for exclusion from any Court-approved class.

38.    Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class and New York Subclass.

39.    <u>Numerosity</u>: While the exact number of Class members cannot be determined yet, the Class and Subclasses consist of hundreds of thousands of people dispersed throughout the

United States. The exact number of Class and Subclasses members can be determined upon review of sales information and other records maintained by FCA. The members of the Class and Subclasses are therefore so numerous that joinder of all members is impracticable.

40.     Commonality: Common questions of law and fact exists as to all members of the Class and Subclass. Among the questions of law and fact common to the Class and Subclass are:

a.  Whether the Defective Vehicles designed and/or sold by FCA possess a material defect;

b.  Whether the E-shift System created an unreasonable risk that the Defective Vehicles would fail to properly park and begin to rollaway;

c.  Whether FCA knew, or should have known, that the Defective Vehicles were defective when it placed the Defective Vehicles into the stream of commerce;

d.  Whether FCA fraudulently concealed the defect from consumers;

e.  Whether the defective E-shift System resulted from FCA's negligence;

f.  Whether FCA is strictly liable for selling the Defective Vehicles;

g.  Whether Plaintiffs and Class members are entitled to damages, including compensatory, exemplary, and statutory damages;

h.  Whether Plaintiffs and Class members are entitled to replacement or repair of their Defective Vehicles; and

i.  Whether Plaintiffs and Class members are entitled to equitable relief, including an injunction requiring that FCA engage in a corrective notice campaign and/or a recall.

41.     Typicality:  Plaintiffs have the same interest in this matter as all other members of the Class and Subclass, and Plaintiffs' claims arise out of the same set of facts and conduct by FCA as the claims of all the other members of the Class and Subclass. Plaintiffs and members of the Class and Subclass own or lease a Defective Vehicle designed and/or manufactured by FCA that contains a uniform Defect that makes them immediately dangerous upon purchase. The defective E-shift System causes the Defective Vehicles to rollaway after the driver exits the

vehicle with the engine still running by providing inadequate feedback as to whether the driver has fully shifted the transmission to Park. The claims of Plaintiffs and the members of the Class and Subclass arise out of FCA's placement into the marketplace of a defective product that created a significant safety risk to consumers, and from FCA's failure to disclose that known safety risk to Plaintiffs and the members of the Class and Subclass. FCA's conduct in designing, manufacturing, marketing, advertising, warranting, and/or selling the Defective Vehicles, in addition to FCA's conduct in concealing their defective nature, is also common to Plaintiffs' and the Class and Subclass members' claims.

42.    Adequacy of Representation:  Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in consumer and product liability class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class and Subclass. Plaintiffs' claims are coincident with, and not antagonistic to, those of the other members of the Class and Subclass they seek to represent. Plaintiffs have no disabling conflicts with the any members of the Class or Subclass, and they will fairly and adequately represent the interests of the members of the Class and Subclass.

43.    Injunctive/Declaratory Relief:  The elements of Rule 23(b)(2) are met. FCA will continue to commit the unlawful practices alleged herein, and the members of the Class and Subclass and the general public will continue to remain at an unreasonable and serious personal safety risk as a result of the Defect. FCA has acted and refused to act on grounds that apply generally to the Class and Subclass, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class and Subclass as a whole.

44.    Predominance: The elements of Rule 23(b)(3) are met. The common questions of law and fact enumerated above predominate over the questions affecting only individual

18

members of the Class and Subclass, and a class action is the superior method for the fair and efficient adjudication of this controversy. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources will be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of hundreds or thousands of claimants in one suit would be impractical or impossible. Individualized rulings and judgments could result in inconsistent relief for similarly-situated plaintiffs. Plaintiffs' counsel, who are highly-experienced in class action litigation, foresee little difficulty in the management of this case as a class action.

## TOLLING OF THE STATUTES OF LIMITATIONS

45.    The claims alleged herein accrued upon the discovery of the defective nature of the Defective Vehicles, which manifested itself when the Defective Vehicles began to rollaway after drivers exited the vehicles with the engine still running and intending to place the transmission in Park. Because the defect alleged herein is hidden, and, as described above, FCA failed to disclose the true character, nature, and quality of the Defective Vehicles, Plaintiffs and the Class and Subclass members did not discover, and could not have discovered, the defect through reasonable and diligent investigation. Plaintiffs' own visual examination of the Defective Vehicles when purchased, as well as their initial use of the Defective Vehicles, did not immediately reveal the defective nature of the Defective Vehicles.

46.    Any applicable statutes of limitations have been tolled by FCA's knowledge, misrepresentation, and/or concealment and denial of the facts as alleged herein. Plaintiffs and the Class and Subclass members could not have reasonably discovered the true defective nature of the Defective Vehicles before the defect manifested itself, and FCA continues to conceal and/or

misrepresent the existence of the defect. As a result of FCA's active concealment of the defect and/or failure to inform Plaintiffs and the Class and Subclass members of the defect, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VI.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**(Violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.)**

47.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

48.    This claim is brought on behalf of the Nationwide Class.

49.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301(3).

50.    FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 230 (4)-(5).

51.    The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

52.    Under 15 U.S.C. § 2310(d)(1), the MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

53.    FCA's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Defective Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

54.    FCA breached these warranties. The Defective Vehicles are equipped with a defective E-shift System that fails to shift into gear and places drivers at risk of significant personal harm and property damage. The Defective Vehicles share a common design defect in that the E-shift System is defectively designed and creates an unreasonable risk of harm, contrary

to FCA's representations about its vehicles. FCA's breach of warranty has deprived Plaintiffs and other Class members of the benefit of their bargain.

55.    Plaintiffs and the other Class members have had sufficient direct dealings with either FCA or its agents (*e.g.* dealerships and technical support) to establish privity of contract between FCA, and the one hand, and Plaintiffs and the Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the Class members are intended third-party beneficiaries of the contracts between FCA and its dealers, specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles. The warranty agreements were designed for and intended to benefit consumers, like Plaintiffs and the Class members, only.

56.    Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. FCA has had over a year to provide a suitable repair for the defective E-shift System and has done nothing but simply notify registered owners of the Defective Vehicles.

57.    At the time of sale or lease of each Defective Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

58.     Plaintiffs and the Class members would suffer economic hardship if they returned their Defective Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class members have not re-accepted their Defective Vehicles by retaining them.

59.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

60.     Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of the Defective Vehicles, in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF
### (Negligence)

61.     Plaintiffs, on behalf of themselves and the Nationwide Class, hereby re-allege the paragraphs above as if fully set forth herein.

62.     FCA owes Plaintiffs and the Nationwide Class a duty to provide thorough notice of known safety defects, such as the defect outlined herein.

63.     FCA also owes Plaintiffs and the Nationwide Class a duty, once it discovered the defect, to ensure that an appropriate repair procedure was developed and made available to consumers.

64.     FCA owes Plaintiffs and the Nationwide Class a duty not to engage in fraudulent or deceptive conduct, including the knowing concealment of material information such as the existence of the defect. This duty is independent of any contractual duties FCA may owe or have owed.

65.     FCA also owes an independent duty to Plaintiffs and the Nationwide Class to disclose the rollaway defect under the TREAD Act, 49 U.S.C. §§ 30101 et seq., and its implementing regulations. Under the Act, FCA must send notice the Defective Vehicle owners, purchasers, and dealers whenever it "learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety."  49 U.S.C. § 30118(c). FCA was aware of the defect in the Defective Vehicles, yet failed to timely notify vehicle owners, purchasers, and dealers about the defect. This duty is independent of any contractual duties FCA may owe or have owed.

66.     A finding that FCA owes a duty to Plaintiffs and the Nationwide Class would not significantly burden FCA. FCA has the means to efficiently notify drivers of the Defective Vehicles about dangerous defects. The cost borne by FCA for these efforts is insignificant in light of the dangers posed to Plaintiffs and the Nationwide Class by FCA's failure to disclose the defect and provide an appropriate notice and repair.

67.     FCA's failure to disclose the rollaway issue in the Defective Vehicles to consumers was a departure from the reasonable standard of care.

68.     Accordingly, FCA breached its duties to Plaintiffs and the Nationwide Class.

69.     Moreover, FCA's conduct was contrary to public policy favoring the disclosure of defects that may affect customer safety; these policies are embodied in the TREAD Act, and the notification requirements in 49 C.F.R. §§ 573.1 et seq.

70.     As a direct, reasonably foreseeable, and proximate result of FCA's failure to exercise reasonable care, inform Plaintiffs and the Nationwide Class of the defect, and provide appropriate repair procedures for the defect, Plaintiffs and the Nationwide Class have suffered

damages including spending more money on the Defective Vehicles than they otherwise would have, which are of diminished value, and on repairs to their Defective Vehicles.

71.    Plaintiffs and the Nationwide Class could not have prevented the injuries caused by FCA's negligence through the exercise of reasonable diligence. Neither Plaintiffs nor the Nationwide Class contributed in any way to FCA's failure to provide appropriate notice and repair procedures.

72.    Plaintiffs, individually and on behalf of the Nationwide Class, seek to recover the damages caused by FCA. Because FCA acted fraudulently and with wanton and reckless misconduct, Plaintiffs also seek an award of exemplary damages.

**THIRD CLAIM FOR RELIEF**
**(Violations of New York General Business Law, N.Y. Gen. Bus. Law § 349)**

73.    Plaintiffs, on behalf of themselves and the New York Subclass, hereby re-allege the paragraphs above as though fully set forth herein.

74.    Plaintiffs and the New York Subclass are "persons" within the meaning of the New York General Business Law ("NYGBL"), N.Y. Gen. Bus. Law § 349(h).

75.    FCA is a "person," "firm," "corporation," or "association" within the meaning of the NYGBL.

76.    The NYGBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349(a). FCA's conduct directed toward consumers, as described herein, constitutes "deceptive acts or practices" within the meaning of the NYGBL.

77.    FCA has long known the Defective Vehicles are defective, including when it developed, manufactured, marketed and sold the Defective Vehicles. Furthermore, FCA knows the defect poses serious safety risks to consumers like Plaintiffs and the New York Subclass.

78.     Nonetheless, FCA has concealed its knowledge of the defect from consumers and sold Defective Vehicles as safe for normal use.

79.     The defect created and continues to create serious safety risks, which were hidden from consumers.

80.     No reasonable consumer would have knowingly bought or leased a Defective Vehicle if that consumer had known it was manufactured and distributed with the defect.

81.     FCA did not adequately recall the Defective Vehicles, nor did it adequately notify consumers that the Defective Vehicles were dangerous to occupants.

82.     FCA owed Plaintiffs and the New York Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Defective Vehicles while purposefully withholding materials facts from Plaintiffs and the New York Subclass that contradicted those representations.

83.     By concealing the serious safety risk posed by its Defective Vehicles, concealing the existence of the defect and by representing that the Defective Vehicles were safe, FCA engaged in actionable conduct within the meaning of the NYGBL.

84.     Had FCA disclosed the true quality and defective nature of the Defective Vehicles, Plaintiff Mack and the New York Subclass would not have purchased the Defective Vehicles or would have paid substantially less for them.

85.     FCA violated the NYGBL when it concealed and/or failed to disclose the serious safety risks to consumers that its Defective Vehicles posed, when it concealed and/or failed to disclose the fact that the Defective Vehicles were defective as described herein, and when it

breached its duty to disclose the safety risks and the defect, instead selling and distributing the Defective Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

86.     FCA's violations present a continuing risk to Plaintiffs and the New York Subclass as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

87.     As a direct and proximate result of FCA's violation of the NYGBL, Plaintiffs and the New York Subclass were damaged.

88.     Plaintiffs and the New York Subclass seek punitive damages against FCA because its conduct was egregious. FCA misrepresented the safety and reliability of the Defective Vehicles, concealed the defect alleged herein, and concealed materials facts that only FCA knew. FCA's egregious conduct warrants punitive damages.

89.     Because FCA's wrongful conduct was willful and knowing, Plaintiffs and the New York Subclass seek recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining FCA's unfair and/or deceptive acts and practices, and any other relief available under the NYGBL.

**FOURTH CLAIM FOR RELIEF**
**(Violations of New York General Business Law, N.Y. Gen. Bus. Law § 350)**

90.     Plaintiffs, on behalf of themselves and the New York Subclass, hereby re-allege the paragraphs above as though fully set forth herein.

91.     FCA was and is engaged in the "conduct of business, trade or commerce" within the meaning of the New York General Business Law ("NYGBL"), N.Y. Gen. Bus. Law § 350.

92.    Section 350 of the NYGBL makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity . . ." N.Y. Gen. Bus. Law § 350-a(1).

93.    Through its advertising, FCA caused to be made or disseminated throughout New York statements that were untrue or misleading, and that were known, or which should have been known to FCA, to be untrue and misleading to consumers in New York.

94.    FCA violated section 350 of the NYGBL because the misrepresentations and omissions regarding the defect in Defective Vehicles, and FCA's failure to disclose and active concealing of the defect, were material and likely to deceive a reasonable consumer.

95.    As a direct and proximate result of FCA's violation of section 350 of the NYGBL, Plaintiffs and the New York Subclass were damaged in that they would not have purchased Class Vehicles and/or paid as much for them.

96.    Under section 350(e), Plaintiffs and the New York Subclass seek monetary relief against FCA measured as (1) actual damages in an amount to be determined at trial, and (2) statutory damages in the amount of $500 for each member of the New York Subclass. Because FCA's conduct was committed willfully and knowingly, New York Subclass members are entitled to recover three times actual damages, up to $10,000, for each member of the New York Subclass.

97.    Plaintiffs and the New York Subclass also seek an order enjoining FCA's unfair, unlawful and/or deceptive practices; attorneys' fees; and any other relief available under section 350 of the NYGBL.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated persons, request that the Court enter judgment against FCA and in favor of Plaintiffs and the Class and New York Subclass, and grant the following relief:

98.    Determine that this action may be maintained as a class action under Fed. R. Civ. P. 23, and designate and appoint Plaintiffs' chosen counsel as Class Counsel and Plaintiffs as the Class Representatives;

99.    Determine that FCA's conduct as alleged herein was unlawful, unfair, and/or deceptive and otherwise in violation of law;

100.    Enjoin any such future conduct by FCA;

101.    Award Plaintiffs and the Class Members actual, compensatory damages or, in the alternative, statutory damages, as proven at trial;

102.    Award Plaintiffs and the Class Members exemplary damages in such amount as proven;

103.    Award damages and other remedies, including, but not limited to, restitution and statutory penalties, as allowed by any applicable law, such as the consumer laws of the various states;

104.    Award Plaintiffs and the Class Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

105.    Award Plaintiffs and the Class Members such other further and different relief as the case may require or as determined to be just, equitable and proper by this Court.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all similarly situated persons, demand a trial by jury on all issues that are triable to a jury.


Dated: July 26, 2016                    Respectfully submitted,

                                        SQUITIERI & FEARON, LLP

                                        By: /s/s Stephen J. Fearon, Jr.
                                                Stephen J. Fearon, Jr.
                                        32 East 57th Street
                                        12th Floor
                                        New York, New York 10022
                                        Telephone: (212) 421-6492
                                        stephen@sfclasslaw.com

                                        **WEXLER WALLACE LLP**
                                        55 W. Monroe Street, Suite 3300
                                        Chicago, IL 60603
                                        Telephone: (312) 346-2222
                                        eaw@wexlerwallace.com
                                        aek@wexlerwallace.com
                                        tjs@wexlerwallace.com

                                        Gregory F. Coleman
                                        Mark E. Silvey
                                        **GREG COLEMAN LAW PC**
                                        800 S. Gay Street
                                        Suite 1100
                                        Knoxville, TN 37929
                                        Telephone: (865) 522-0049
                                        greg@gregcolemanlaw.com
                                        mark@gregcolemanlaw.com

                                        John A. Yanchunis
                                        **MORGAN & MORGAN**
                                        **COMPLEX LITIGATION GROUP**
                                        201 N. Franklin Street, 7th Floor
                                        Tampa, FL 33602
                                        Telephone: (813) 223-5505
                                        jyanchunis@ForThePeople.com

                                        *Attorneys for Plaintiffs and the Putative Class*

29